51 P.3d 744 (2002)
146 Wash.2d 778
PUBLIC UTILITY DISTRICT NO. 1, OF PEND OREILLE COUNTY, Respondent,
v.
STATE of Washington, DEPARTMENT OF ECOLOGY, Petitioner, and
Center for Environmental Law and Policy, Intervenor/Respondent.
No. 70372-8.
Supreme Court of Washington, En Banc.
Argued September 25, 2001.
Decided July 18, 2002.
*747 Christine Gregoire, Attorney General, Alan Reichman, Asst., Olympia, Deborah Mull, Asst., Lacey, John Arum, Seattle, for Petitioner.
Jerry Boyd, Spokane, for Respondent.
Sarah Mack, Seattle, Amicus Curiae on Behalf of Washington Public Utility Districts.
Adam Gravley, Catherine Drews, Seattle, Amicus Curiae on Behalf of Washington Water Utility Council.
Joseph Mentor, William Clarke, Seattle, Amicus Curiae on Behalf of Washington Association of Realtors, Washington Building Industry, and Washington State Hydropower Issue Group.
Rachael Paschal Osborn, Spokane, Amicus Curiae on Behalf of Lands Council, Pend Oreille Enviro. Team, River Defenders and Spokane Canoe & Kayak Club.
Bradford Axel, Katherine Ransel, Seattle, Donald Ayer, Robin Juni, Matthew Duchesne, Washington DC, Amicus Curiae on Behalf of American Rivers. *745
*746 MADSEN, J.
This case raises the question whether the Department of Ecology has authority to condition a water quality certification under the Clean Water Act (33 U.S.C. §§ 1251-1387) on maintenance of minimum instream flows, where such conditions affect existing water rights. The case also involves issues concerning RCW 90.03.380, the surface water statute governing changes in and transfers of water rights, and issues of abandonment and statutory forfeiture of water rights. We conclude that the Department of Ecology has authority to impose bypass flow conditions in a water quality certification regardless of whether the applicant has existing water rights that may be affected. We also conclude that when acting on change applications under RCW 90.03.380, Ecology may not deny an application based upon public interest considerations, and that the change statute does not apply to inchoate water rights. In addition, we conclude that the water rights at issue were neither abandoned nor forfeited under chapter 90.14 RCW.

FACTS
In November 1994, Public Utility District No. 1 of Pend Oreille County (the District) applied to the Federal Energy Regulatory Commission to amend its hydroelectric license, issued under the Federal Power Act (16 U.S.C. §§ 791-839), in order to develop the Sullivan Creek Hydroelectric Project. The District plans to release water from Sullivan Lake to Mill Pond Reservoir. Water from Mill Pond will then be diverted for approximately three miles by pipeline following an existing flume right of way to a powerhouse located near Metaline Falls. The water will then be discharged back into Sullivan Creek at the powerhouse. The bypass reach of Sullivan Creek from Mill Pond to the powerhouse is about three and a quarter miles.
The District holds water rights in dispute in this case of 550 cubic feet per second (cfs) on Sullivan Creek, Harvey Creek, and Sullivan Lake, which include the right to store, divert, and use water to generate hydroelectric power. A right of 110 cfs has a priority date of June 26, 1907, and includes diversion and storage rights. The remaining 440 cfs is a permitted, unperfected right that has a priority date of June 3, 1980. It is subject to a minimum instream flow of 10 cfs in Sullivan Creek. The 1980 right is supplementary to the 1907 right.
Before 1956, the Portland Cement Company and Lehigh Portland Cement Company owned the Sullivan Lake Hydroelectric Project, which included the Sullivan Lake Dam *748 and reservoir. The reservoir was used to store water for later release to generate power. The project included the Mill Pond dam and diversion works, which diverted water into a wooden flume and canal system to a forebay, from which the water was transported to the Sullivan Creek powerhouse. The project was used to generate power from 1907 to 1956.
In 1956, a portion of the flume collapsed. Also in 1956, the District agreed to purchase the project together with the 1907 water right, provided a license was obtained under the Federal Power Act. In 1958, the Federal Power Commission granted a 50-year nongenerating license that allowed the District to use its storage right for the storage and release of water for power generation by others. The nongenerating license included language that indicated the Sullivan Creek project had been abandoned, but contemplated that generation of hydroelectric power utilizing the Sullivan Creek Project would be reestablished when feasible. In 1959, the District requested and obtained an amendment to the license, in order to clarify that it intended to preserve its water right for use in power production.
Following its purchase, the District took no action to maintain the flume or intake structure that had been used to divert water for power generation. The District decommissioned the project, removing the turbines and filling the turbine pits with rock and gravel.
The District engaged in feasibility studies beginning in 1961, which led to possible new projects involving construction of a new dam. In 1965, the District applied for a new federal license for a hydroelectric project. Maps accompanying the application indicated that the wooden flume had collapsed. In 1964, the District applied for and obtained additional water rights and a change in point of diversion to support the power project under this application. Thus, a change in point of diversion of the 1907 right was approved, with the new diversion point located just south of the confluence of Sullivan Creek and Outlook Creek, at an anticipated new reservoir site. In 1966, Ecology approved a reservoir permit for the proposed project. By 1969, the District concluded that the 1965 development plan was not economically feasible, and abandoned that project. In 1978, the District had a short-term contract to sell power from a proposed new Sullivan Creek project, including an expanded reservoir. After the other contracting party withdrew, this project was put on hold. No other decision to proceed with a hydroelectric project was made until the District filed its 1994 application to amend its license in order to generate power. The District did, however, engage in a number of engineering studies in the meantime, and, as indicated, in 1980 it applied for a supplementary water right for future development of the Sullivan Creek project. The application was granted in 1986.
The District paid all annual state hydroelectric licensing fees in connection with its 1907 water right. It also paid fees in connection with the 1980 water right, although for a period of years it failed to pay the fees for most of the 440 cfs right, due to a clerical error. In 1998, it informed Ecology about the missing fees, and paid the late fees.
In 1992, the District proposed to reestablish power generation. The new Sullivan Creek Project would use the same configuration for the project as the original project, but would be bigger than the original. As noted, in 1994 the District filed the application with the Federal Energy Regulatory Commission to amend its federal license to allow power generation. Because the project requires a federal license, on October 30, 1996, the District filed an application for a state water quality certification with the Department of Ecology (Ecology), as required under the Clean Water Act. On October 28, 1997, Ecology issued an order certifying that the District's project complies with the act and state law, but conditioned the certification on maintenance of additional specified instream flows in Sullivan Creek.[1] Ecology *749 imposed these conditions to meet state and federal clean water standards prohibiting degradation of state waters that would interfere with or injure existing beneficial uses. Sullivan Creek provides habitat for several fish species, including rainbow, brown, and cutthroat trout, as well as serving as a significant recreational and aesthetic resource.
In order to carry out its new proposed project, on June 7, 1993, the District filed two applications to change the points of diversion of the 1907 and 1980 rights to the original diversion point of the 1907 water right, about 7,500 feet downstream. On March 17, 1998, Ecology issued orders denying the applications. As to the 1907 right, Ecology denied the change application on the bases that the District had abandoned the right based upon nonuse of the water since 1956, and that approval of the change would be detrimental to the public interest. As to the 1980 right, Ecology denied the change application on the bases that a change may not be granted where inchoate water rights are concerned, that the right had been relinquished due to failure to pay annual hydroelectric licensing fees, and that approval would be contrary to the public interest.
The District appealed from all three orders to the Pollution Control Hearings Board (Board). The Center for Environmental law and Policy intervened in the appeal of the water quality certification. The Board consolidated the appeals. The District and Ecology then filed cross motions for summary judgment. On October 15, 1998, the Board issued an amended summary judgment order. The Board granted summary judgment in favor of Ecology, ruling, in relevant part, that (1) Ecology has authority to condition a water quality certification under § 401 on maintenance of specified instream flows where the applicant has existing water rights; (2) RCW 90.03.380, the statute relating to changes and transfers of surface water rights, does not apply to inchoate rights, and thus Ecology's denial of a change in point of diversion of water under the 1980 right was correct; (3) Ecology has authority to consider the public interest when acting on an application for a change in point of diversion under RCW 90.03.380; (4) and Ecology and the Board have authority to make tentative determinations as to the validity of water rights when acting on and reviewing the propriety of a change application. The Board granted summary judgment in favor of the District on the issue whether it had relinquished its 1980 water right for failure to timely pay the annual hydroelectric licensing fees. The Board denied summary judgment on the issue of abandonment of the 1907 right.
The District, with Ecology's concurrence, sought interlocutory review of the summary judgment order by this court. Review was denied.
A final adjudicatory hearing on remaining issues was held January 25 through 27, 2000. On August 15, 2000, the Board issued its amended final findings of fact and conclusions of law and order. In relevant part, the Board upheld the bypass flow conditions in the § 401 water quality certification. The Board stated that the District's proposed project, with its withdrawal of water from the bypass reach, will "be devastating to existing spawning habitat." Clerk's Papers (Final Findings of Fact, Conclusions of Law No. 45, and PCHB Order No. 97-177) at 17-18 (although denominated a conclusion of law, this part of conclusion 45 is a finding of fact). The Board found that "the state has reasonably required that the power project protect an already impaired stream, due in large part from the District's dam, from further habitat degradation." Clerk's Papers (Final Findings of Fact, Conclusions of Law No. 26) at 11. The Board reversed Ecology's denial of a change in point of diversion of the 1907 water right, ruling that the District did not abandon its 1907 water right and remanding to Ecology for consideration of whether a change would be contrary to the *750 public interest in light of the bypass flow conditions in the § 401 certification. Other issues resolved by the Board are not pertinent to our review.
Both Ecology and the District sought review in Pend Oreille County Superior Court. The court consolidated the petitions for review. On October 31, 2000, the Board issued a certificate of appealability pursuant to RCW 34.05.518. Ecology then filed a motion for discretionary review by this court, and the District filed an answer, raising additional issues. Direct discretionary review was granted.

I. RCW 90.03.380
A. Application to Inchoate Water Rights
This court reviews the Board's orders under the state Administrative Procedures Act. Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 76-77, 11 P.3d 726 (2000); Dep't of Ecology v. Theodoratus, 135 Wash.2d 582, 589, 957 P.2d 1241 (1998). The court applies the standards of review in RCW 34.05.570(3) directly to the agency record. Postema, 142 Wash.2d at 77, 11 P.3d 726; Theodoratus, 135 Wash.2d at 589, 957 P.2d 1241. Relief may be granted where the agency's interpretation or application of the law is erroneous, the order is not supported by substantial evidence, or the order is arbitrary or capricious. RCW 34.05.570(3)(d),(e),(i); see Postema, 142 Wash.2d at 77, 11 P.3d 726; Okanogan Wilderness League, Inc. v. Town of Twisp, 133 Wash.2d 769, 776, 947 P.2d 732 (1997).
Here, the facts are not disputed. Our review is of the agency's interpretation of the law and application of the law to the facts. Where statutory construction is concerned, the error of law standard applies. RCW 34.05.570(3)(d). Under this standard, the court determines the meaning and purpose of a statute de novo, although in the case of an ambiguous statute which falls within the agency's expertise, the agency's interpretation of the statute is accorded great weight, provided it does not conflict with the statute. Postema, 142 Wash.2d at 77, 11 P.3d 726. The burden of establishing the invalidity of agency action is on the party asserting the invalidity. RCW 35.04.570(1)(a); Postema, 142 Wash.2d at 77, 11 P.3d 726.
The District contends that the Board erred in affirming Ecology's denial of a change in point of diversion of water under the 1980 inchoate water right.[2] The District argues that to the extent our decisions in Okanogan Wilderness League and R.D. Merrill Co. v. Pollution Control Hearings Board, 137 Wash.2d 118, 969 P.2d 458 (1999) hold that inchoate rights are not subject to change under RCW 90.03-380, they should be overruled.
Applications for changes and transfers of surface water rights generally are governed by RCW 90.03.380. As we explained in Okanogan Wilderness League, 133 Wash.2d at 777-78, 947 P.2d 732, RCW 90.03.380 presumes that water has actually been put to beneficial use, thus permitting changes in point of diversion if, and to the extent that, the water has been beneficially used. See also R.D. Merrill, 137 Wash.2d at 125, 969 P.2d 458. As we noted, the statute thus accords with a number of western water law decisions. Okanogan Wilderness League, 133 Wash.2d at 778, 947 P.2d 732 (citing cases).
The Distinct maintains, though, that we failed to distinguish between the first sentence of the statute and the second. RCW 90.03.380(1) provides in relevant part:
The right to the use of water which has been applied to a beneficial use in the state shall be and remain appurtenant to the land or place upon which the same is used.... The point of diversion of water for beneficial use or the purpose of use *751 may be changed, if such change can be made without detriment or injury to existing rights.
In the District's view, the first sentence requires that water actually be beneficially used before it can become appurtenant to the land, but the second allows a change in point of diversion of water for a beneficial use prior to applying water to a beneficial use.
We do not agree. First, statutes should be read as a whole and, here, when read as a whole the statute's reference to "beneficial use" in the second sentence indicates the same beneficial use requirement as in the first sentenceactual beneficial use. See Donovick v. Seattle-First Nat'l Bank, 111 Wash.2d 413, 415, 757 P.2d 1378 (1988) (statutes should be read in its entirety).
Second, where the Legislature has intended that unperfected rights be covered by a change statute, it has plainly provided so. Unlike the surface water change statute, the ground water change statute does authorize a change in the place of withdrawal under an unperfected right. RCW 90.44.100; see R.D. Merrill, 137 Wash.2d at 130, 969 P.2d 458. The difference in the two statutes shows that the Legislature intended they do not apply to the same type of rights. See Clallam County Deputy Sheriff's Guild v. Bd. of Clallam County Comm'rs, 92 Wash.2d 844, 851, 601 P.2d 943 (1979); State ex rel. Bell v. Superior Court for King County, 196 Wash. 428, 433, 83 P.2d 246 (1938); State v. Hubbard, 106 Wash.App. 149, 153, 22 P.3d 296, review denied, 145 Wash.2d 1004, 35 P.3d 380 (2001). We will not disturb the Legislature's deliberate choice to treat the two types of water rights differently.
Third, the Legislature has confirmed our reading of RCW 90.03.380. In 1999, subsequent to our decision in Okanogan Wilderness League, the Legislature enacted two statutes providing for changes in point of diversion where inchoate rights are involved. In RCW 90.03.395, the Legislature stated that it
intends to allow modification of the point of diversion in a water right permit when such a modification will provide both environmental benefits and water supply benefits and nothing in RCW 90.03.397 is to be construed as allowing any other change or transfer of a right to the use of surface water which has not been applied to a beneficial use.

(Emphasis added.) RCW 90.03.397 states in relevant part:
The department may approve a change of the point of diversion prescribed in a permit to appropriate water for a beneficial use to a point of diversion that is located downstream and is an existing approved intake structure with capacity to transport the additional diversion, if the ownership, purpose of use, season of use, and place of use of the permit remain the same.
This section may not be construed as limiting in any manner whatsoever other authorities of the department under RCW 90.03.380 or other changes that may be approved under RCW 90.03.380 under authorities existing before July 25, 1999.
(Emphasis added.) The Legislature has thus acknowledged our reading of RCW 90.03.380, created exceptions to the rule that inchoate surface water rights are not subject to change in point of diversion, and emphasized that no other change may be made if the water has not been applied to a beneficial use.
Additionally, while the Legislature enacted these two statutes subsequent to Okanogan Wilderness League, it did not amend RCW 90.03.380 to allow for a change in point of diversion where inchoate water rights are concerned.
Finally, in support of its interpretation of RCW 90.03.380, the District claims that it is likely that a change in point of diversion may be necessary in order to fully develop a water right, reasoning that engineering and other considerations will result in changes in some of the details relating to the best plans for use of a water right. However, a surface water right, involving as it does withdrawal from a visible source, does not present the engineering and planning difficulties that groundwater withdrawal may present, and this may be one distinction underlying the difference in the surface water and ground *752 water change statutes vis-à-vis inchoate rights.[3]
We conclude, as we did in Okanogan Wilderness League and R.D. Merrill, that RCW 90.03.380 requires that water must have been applied to beneficial use before a change in point of diversion is authorized under RCW 90.03.380. We uphold Ecology's denial of the change application for the 1980 inchoate right. The Board's grant of summary judgment in favor of Ecology on this issue is affirmed.
B. Tentative Determinations
The District maintains that neither Ecology nor the Board has authority to "adjudicate" the District's water rights and determine they had been abandoned when deciding whether an application for change in point of diversion should be granted. We adhere to precedent on this issue.
It is true that neither Ecology nor the Board has the authority to adjudicate water rights. Rettkowski v. Dep't of Ecology, 122 Wash.2d 219, 858 P.2d 232 (1993). However, this court has held that Ecology is required to tentatively determine the existence of a water right before it can approve a change in point of diversion of water under that right. Okanogan Wilderness League, 133 Wash.2d at 778-79, 947 P.2d 732; R.D. Merrill, 137 Wash.2d at 127, 969 P.2d 458. This is because RCW 90.03.380 authorizes a change in point of diversion only where water has been applied to beneficial use, and only where the change will not cause detriment or injury to existing rights. RCW 90.03.380; see Okanogan Wilderness League, 133 Wash.2d at 777-78, 947 P.2d 732; R.D. Merrill, 137 Wash.2d at 125-26, 969 P.2d 458. Therefore, quantification of the right is necessary before a change in point of diversion may be approved. Okanogan Wilderness League, 133 Wash.2d at 779, 947 P.2d 732. "If a right has not been beneficially used to its full extent, or if the right has been abandoned, then issuance of a certificate of change, in the amount of the original right, could cause detriment or injury to other rights." Id. Ecology may therefore deny an application for a change if it determines that the water right has been abandoned or relinquished. However, in light of the fact that Ecology does not have the right to finally adjudicate water rights, its tentative determination as to whether a right has been abandoned or relinquished can not be a final determination of the validity of the water right. Id.
Ecology has authority to tentatively determine whether a water right has been abandoned or relinquished when acting on an application for a change in point of diversion under RCW 90.03.380, and the Board may also do so when reviewing action on a change application. The Board's summary judgment ruling on this issue is affirmed.
C. Public Interest
With regard to the 1907 110 cfs water right, the Board reversed Ecology's finding that the right had been abandoned, but remanded this matter so that Ecology could decide whether approval of the change in point of diversion would be contrary to the public interest in light of the § 401 bypass flow conditions. The District contends that the Board erred in concluding that Ecology could deny an application for a change in point of diversion of water under a "public interest" standard. We agree.
Initially, the reasons for the Board's decision do not support its conclusion. The Board reasoned that this court held that Ecology has an obligation to consider the public interest as it may have evolved since the time of issuance of an original water right certificate. The case upon which the Board relied, Theodoratus, 135 Wash.2d 582, 957 P.2d 1241, is inapposite. There, the court noted that under RCW 90.03.320, Ecology must consider the good faith of the applicant and the public interests when deciding whether to extend the time for completion of a project and application of water to beneficial use, and may condition any extension to satisfy any public interest concerns that *753 arise. Theodoratus, 135 Wash.2d at 597, 957 P.2d 1241. This is because RCW 90.03.320 expressly requires consideration of public interests in such circumstances. Theodoratus does not support the Board's conclusion as to RCW 90.03.380, which does not contain such authorization. The Board also relied on the fact that the groundwater code allows for consideration of the public interest when acting on a change application. Again, however, the groundwater statute affirmatively requires consideration of the public interest in such circumstances. RCW 90.44.100 (requiring findings as prescribed in the case of an original application; see RCW 90.03.290 (incorporated by RCW 90.44.060)). RCW 90.03.290, concerning applications for new permits to appropriate surface waters, expressly requires Ecology to consider the public interest when determining whether to issue a permit.
RCW 90.03.380, the surface water change statute, provides, in contrast, that a change in point of diversion may be granted if the change can be made "without detriment or injury to existing rights," and, as noted, the water must have been put to beneficial use. Okanogan Wilderness League, 133 Wash.2d at 777-78, 947 P.2d 732.[4] The statute's meaning appears plain as to what prerequisites must be met in order to obtain a change in point of diversion, and consideration of the public interest is not required. See State v. J.M., 144 Wash.2d 472, 480, 28 P.3d 720 (2001) (where statute's meaning is plain, court gives effect to that meaning).
However, Ecology cites other statutes that it says gives it authority to consider the public interest when acting on a change application. Ecology maintains that while there is no express language in RCW 90.03.380 concerning a public interest test, Ecology has authority derived from other statutes to consider the public interest. Ecology points to RCW 90.03.005 (policy of the state to promote the use of the public waters to obtain maximum net benefits), and RCW 90.54.020(2), and (10) (in allocation of waters among potential uses and users, the securing of maximum net benefits is directed; expressions of the public interest will be sought at all stages of water planning and allocation). Ecology urges that we read these statutes together with RCW 90.03.380 and harmonize all the statutes.
These statutes do not provide the authorization Ecology claims. First, when an applicant originally seeks to withdraw the public waters, the public interest is a necessary part of the determination to issue a permit to withdraw water. RCW 90.03.290. Therefore, at the point in time that an allocation of public waters is made, the public interest is considered, furthering the policy in RCW 90.03.005 and RCW 90.54.020. However, when an application for change under RCW 90.03.380 is made, the allocation of public waters has already occurred, and the right involved is a perfected water right.
Second, even if any question remained, principles of statutory construction reinforce our conclusion. As noted, the statute governing applications for new water rights, RCW 90.03.290, and the statute permitting extensions of time to complete projects and put beneficial water to use both provide for consideration of the public interest, as does the groundwater change statute, RCW 90.44.100. The presence of the "public interest" requirement in these other statutes and the omission of the requirement in RCW 90.03.380 indicate a difference in legislative intent. Clallam County Deputy Sheriff's Guild, 92 Wash.2d at 851, 601 P.2d 943; State ex rel. Bell, 196 Wash. at 433, 83 P.2d 246; Hubbard, 106 Wash.App. at 153, 22 P.3d 296. Because the Legislature omitted consideration of the public interest from RCW 90.03.380 where it included such a requirement in other closely related statutes, we conclude that Legislative intent is clear that a "public interest" test is not a proper consideration when Ecology acts on a change application under RCW 90.03.380. In addition, RCW 90.03.380(1) directs that if the water has been beneficially used, and "[i]f it shall appear that ... such change may be made without injury or detriment to existing *754 rights, the department shall issue to the applicant a certificate ... granting the right for ... such change of point of diversion[.]" (Emphasis added.) Use of the word "shall" in this statutory context indicates that Ecology must permit the change if the statutory prerequisites are met. See Cazzanigi v. Gen. Elec. Credit Corp., 132 Wash.2d 433, 443, 938 P.2d 819 (1997).[5]
Ecology advances public policy arguments in favor of public interest review when a change application is made. In particular, Ecology posits that one could essentially avoid public interest review by applying for a permit to appropriate water, undergoing public interest review, obtaining a water right, and then seeking to change it without further public interest review. We recognize this may be a legitimate concern, but believe the answer lies in persuading the Legislature to amend the change statute. As one of the amici curiae point out, several western states have change statutes expressly requiring consideration of the public interest when action is taken on an application for a change or transfer of rights.
Ecology does not have authority to consider the public interest when deciding whether to grant an application for a change in point of diversion of water under RCW 90.03.380. The Board's grant of summary judgment in favor of Ecology on this issue is reversed.

II. ABANDONMENT
Ecology denied the District's application for a change in the point of diversion of water under the 1907 water right on the ground that it had been abandoned. The Board ruled that the District did not abandon the right, and remanded the application to Ecology. Ecology maintains the Board erred in concluding the 1907 110 cfs right was not abandoned.
As explained, in order to determine whether a change application may be granted under RCW 90.03.380, Ecology must tentatively quantify the right in order to determine whether the right qualifies for a change. Okanogan Wilderness League, 133 Wash.2d at 777-781, 947 P.2d at 737-38. If the right has been extinguished through relinquishment or abandonment, it is not subject to a certificate of change. Id.
Abandonment is a common law doctrine recognized in this state's decisional law. See, e.g., Okanogan Wilderness League, 133 Wash.2d at 781-81, 784, 947 P.2d 732; R.D. Merrill, 137 Wash.2d at 126-27, 969 P.2d 458; Jensen v. Dep't of Ecology, 102 Wash.2d 109, 685 P.2d 1068 (1984); Miller v. Wheeler, 54 Wash. 429, 103 P. 641 (1909). While, as we noted in Okanogan Wilderness League, 133 Wash.2d at 784, 947 P.2d 732, the court in dicta in Department of Ecology v. Acquavella, 131 Wash.2d 746, 757-58, 935 P.2d 595 (1997) said that RCW 90.14.130-.180 codifies the common law of abandonment, that is not the case. Statutory forfeiture does not require intent to abandon, as does abandonment. Thus, the statutes do not codify the common law doctrine. Moreover, some of the statutes in chapter 90.14 RCW expressly acknowledge abandonment as well as statutory forfeiture. RCW 90.14.160,.170, and .180 each refer to both abandonment and statutory forfeiture for nonuse for a five-year period. RCW 90.14.180, in particular, expressly recognizes abandonment, as opposed to statutory forfeiture for five years' nonuse, in connection with any appropriation perfected under the surface and ground water codes. RCW 90.14.160 refers to both as to any water right acquired through appropriation prior to enactment of the water code, or by custom or general adjudication. Thus, to the extent any question may remain following our decision in Okanogan Wilderness League, 133 Wash.2d 769, 947 P.2d 732, as to whether the common law abandonment doctrine remains viable after 1967, we take this opportunity to put the matter to rest. The common law doctrine of abandonment still exists as part of this state's water law. Our decisions so hold, and the Legislature has clearly not abolished the doctrine; rather it has expressly recognized it.
Abandonment is, as indicated, "the intentional relinquishment of a water *755 right." Okanogan Wilderness League, 133 Wash.2d at 781, 947 P.2d 732 (citing Jensen, 102 Wash.2d at 115, 685 P.2d 1068; Miller, 54 Wash. at 435, 103 P. 641). Intent is determined according to the conduct of the parties. Okanogan Wilderness League, 133 Wash.2d at 781, 947 P.2d 732. The burden of proof of abandonment is on the party alleging abandonment. Id. Nonuse alone does not constitute abandonment. Id. (citing A. DAN TARLOCK, LAW OF WATER RIGHTS AND RESOURCES § 5.18[1], at 5-106 (1996)). Nonuse is, however, evidence of intent to abandon, and long periods of nonuse raise a rebuttable presumption of intent to abandon, thus shifting the burden of proof to the water right holder to explain reasons for the nonuse. Okanogan Wilderness League, 133 Wash.2d at 781, 782-83, 947 P.2d 732.
Here, Ecology contends that there has been a long period of nonuse raising the presumption of intent to abandon. Even if we agreed, we would conclude that the District has not abandoned its 1907 water right.
As noted, water under this right was used to generate power until 1956. While it is true that in 1956 a portion of the flume collapsed, and the District thereafter decommissioned the project insofar as power production is concerned, the District continued to engage in studies, acquired and changed water rights for purposes of power production, and tried to develop projects for hydroelectric power production. The District began feasibility studies in 1961, which led to possible new projects and to the District's application for a new federal license in 1965. In connection with its proposed new project, it applied for and obtained additional water rights and a change in point of diversion of its 1907 right. In 1966, Ecology approved a reservoir permit for the proposed project. Although the District concluded by 1969 that the project was not feasible after all, its efforts to that point do not show intent to abandon its water rights. From 1978 to 1984, the District collaborated on another proposed project, with a contract to sell the power generated to another power company. This proposal, too, fell through. While the District did not pursue plans for another project until it began the process for the present one, it did engage in a number of engineering studies in the meantime. In 1980, it applied for a supplementary water right for future development of the Sullivan Creek project. The District also continued to use its concomitant storage right. Further, the District paid the annual state hydroelectric licensing fees in connection with its 1907 water right.
Although, as Ecology points out, the nongenerating license originally issued to the District included language that indicated the Sullivan Creek project had been abandoned, the evidentiary force of this is diluted by the fact that the license also contemplated that generation of hydroelectric power utilizing the Sullivan Creek Project would be reestablished when feasible. Moreover, in 1959, the District requested and obtained an amendment to the license to make clear that it intended to keep its water right for use in power production.
Under these facts as a whole, which are not disputed by Ecology, we conclude that the District has established that it did not intend to abandon its 1907 water right.
Ecology argues, though, that the facts show only speculative intent to use water at an undetermined point in the future. See Thorp v. McBride, 75 Wash. 466, 135 P. 228 (1913) (claim that water would be used in the future for irrigation, mining, domestic and power completely speculative); In re Clark Fork River Drainage Area, 274 Mont. 340, 908 P.2d 1353 (1995) (50 years of nonuse; only reason advanced to show no intent to abandon was lack of economic viability of mining in the area, where water claimed was for mining purposes); S.E. Colo. Water Conservancy Dist. v. Twin Lake Assocs., Inc., 770 P.2d 1231 (Colo.1989). Ecology also cites City & County of Denver v. Snake River Water Dist., 788 P.2d 772 (Colo.1990), where the court found the presumption of abandonment raised by a long period of nonuse of water right by a company that purchased a nonoperating power plant and its associated water right, and rejected the argument that no intent to abandon could be found because the owner had sold small portions of the water right on two occasions during a 29 year period.
*756 Ecology further maintains that the evidence shows that the District's only intent when purchasing the power plant was to utilize the storage rights to release water for downstream hydroelectric production, and that it has admitted on a number of occasions that it abandoned or terminated the project. Ecology maintains this case is more compelling on the issue of abandonment than Okanogan Wilderness League. Ecology says that feasibility studies do not rebut the presumption of intent to abandon, relying on R.D. Merrill by analogy, that maintenance of the storage component of the 1907 right is completely unrelated to the diversionary right, and that the fact that the District paid hydroelectric licensing fees is not sufficient to rebut the presumption of abandonment, particularly where the District paid the fees for an undeveloped hydroelectric project.
None of the cases relied upon by Ecology has a similar totality of facts to those that occur in this case. The District engaged in repeated, and ongoing attempts to come up with a feasible hydroelectric project. It did not simply wait until economic conditions improved or future events occurred that provided uses for water, as the claimants in Thorp and In re Clark Fork River Drainage did. A review of City & County of Denver shows no similar efforts to those made here and, as the Board noted, the case actually supports the proposition that attempts to sell a water right are evidence of intent not to abandon the right. City & County of Denver, 788 P.2d at 778. Here, as the Board also observed, the District engaged in attempts to develop and market a power project. Okanogan Wilderness League is clearly distinguishable, as the water right holder there offered a single, invalid reason for nonuse of the water right at issue. R.D. Merrill's discussion of feasibility studies is premised on specific statutory language respecting an exception to statutory forfeiture, which is tangentially relevant here, at best. In this case, the District's storage and diversionary rights are too closely related for us to conclude that maintenance of the storage right has absolutely no relevance on the question of abandonment. Finally, while payment of licensing fees for an undeveloped project might be insufficient, alone, to rebut a presumption of abandonment, it is but one factor to be considered.
The record as a whole shows that the District has met its burden to rebut any presumption of abandonment. Ecology improperly denied the application for a change in point of diversion of the 1907 water right based on abandonment. The Board is affirmed on this issue.

III. STATUTORY FORFEITURE; RCW 90.16.060
Ecology also denied the District's application for a change of point of diversion on the basis that under chapter 90.14 RCW the District relinquished most of its 440 cfs under its 1980 permit, because the right was unused for over five years. The Board reversed. As Ecology points out, this basis for denial of a change in point of diversion is mooted by our holding that an inchoate right is not subject to change under RCW 90.03.380. In any event, the Board's decision is correct. First, RCW 90.14.150 provides that nothing in chapter 90.14 RCW "shall be construed to affect any rights or privileges arising from any permit to withdraw public waters or any application for such permit, but the department of ecology shall grant extensions of time to the holder of a preliminary permit only as provided by RCW 90.03.290." Thus, the Legislature has plainly made statutory forfeiture inapplicable to unperfected water rights.
Ecology maintains, though, that RCW 90.14.150 must be harmonized with RCW 90.14.140(2) and RCW 90.16.060. We will not harmonize RCW 90.14.140(2) with RCW 90.14.150 where the latter statute plainly states that chapter 90.14 RCW does not apply to affect rights under a permit. Were we to do otherwise, it would be in blatant disregard of expressed legislative intent.
However, there remains a question whether the right has been abandoned under the provisions of RCW 90.16.060. The Board granted summary judgment to the District on the issue of whether it abandoned its water rights for failure to timely pay the annual hydroelectric power fees to Ecology. The Board stated that there was no genuine *757 issue of material fact that the District inadvertently failed to pay a portion of its annual licensing fees for hydroelectric projects under RCW 90.16.060 from 1986 to 1993, and that the District had established that the missed payments were the result of a clerical error. The late fees and penalties were paid in 1998. From 1992 forward, the correct fees were paid. PUD No. 1 of Pend Oreille County v. Dep't of Ecology, No. 97-177 (Amended Summary Judgment and Order, Factual Background XL, XXVII, Wash. Oct. 15, 1998).[6]
RCW 90.16.050 and RCW 90.16.060 require the filing of annual statements showing the extent of claims for power development and the payment of annual licensing fees. Ecology argues that the District failed to claim the full 440 cfs right for power development and failed to pay licensing fees, and that under RCW 90.16.060 this is conclusive evidence of abandonment of the water right used or proposed to be used for power development. We do not read RCW 90.16.060 as providing for such abandonment. First, as to payment of fees, the statute states that "the failure to file statement and pay the fees, as herein required, for any power site or claim of power rights on account of riparian ownership within two years after June 12, 1929, shall be conclusive evidence of abandonment." RCW 90.16.060 (emphasis added). The statute was enacted in 1929 and, evidently, the quoted language was intended to assure that power developers complied with the new act's provisions in a timely fashion. Nothing in the statute indicates that the abandonment provision applies to the failure to pay fees after 1931. Moreover, the rest of the statute demonstrates that it does not. RCW 90.16.060 also provides that
[s]hould any claimant fail or neglect to file such statement within the time specified, or fail or neglect to pay such fees within the time specified, the fees due and payable shall be at the schedule rates set out in RCW 90.16.050, increased twenty-five percent, and the state shall have preference lien therefor, with interest at the rate of ten percent per annum from the date of delinquency[.]
We do not believe the Legislature intended that a water right would be deemed conclusively abandoned, while at the same time allowing the late payment of fees relating to that right. Nor do we understand why a claimant would pay late fees once the water right necessary for power production was abandoned. By allowing the late payment of fees, with penalty and interest, the Legislature plainly contemplated that the statement could be filed and licensing fees could be paid late without abandoning the water right(s) involved.
We would have to read the "June 12, 1929" date out of the statute in order to read the statute as Ecology would have us do. We decline to do so. We also decline to render the language allowing the late payment of fees superfluous. See Svendsen v. Stock, 143 Wash.2d 546, 555, 23 P.3d 455 (2001) (statutes should not be construed to render any portion superfluous). We note that our decision does not leave a void in the law. Common law abandonment principles and statutory forfeiture (and its exceptions) may apply, and other statutes govern requirements for perfection of a water right, including the diligence required in perfecting permitted water rights.
As to the failure to file the annual statement claiming the full 440 cfs, the statute plainly ties the filing of the annual statement and payment of licensing fees together. By allowing the later payment of the licensing fees where they have not been paid, the statute contemplates that the claimant may correct the failure or neglect to pay. We believe that it necessarily follows that the claimant may also correct the statement of the amount of water under the claimed water rights. Otherwise, the right to pay late fees, as the statute allows, would be meaningless.
We conclude that the District has not abandoned any portion of its 440 cfs inchoate *758 right under RCW 90.16.060 by failing to timely pay licensing fees and claim the full extent of its water right, because it lawfully paid its fees, together with penalty and interest, as permitted by the statute. Accordingly, the Board's grant of summary judgment in favor of the District on this issue is affirmed.

IV. CLEAN WATER ACT: SECTION 401 WATER QUALITY CERTIFICATION
The District maintains that the Board erred in ruling that Ecology has authority to impose conditions on the water quality certification for the Sullivan Creek Project which require that the District leave specified minimum flows in the creek. The District maintains that contrary to the Board's conclusion, Pub. Util. Dist. No. 1 of Jefferson County v. Wash. Dep't of Ecology, 511 U.S. 700, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) (Elkhorn II), does not control this issue, because unlike the circumstances there, the District has existing water rights. The District also contends that Ecology does not have authority to limit and restrict existing water rights as part of a water quality certification. Further, the District contends, Ecology may not establish minimum stream flows as a condition to a water quality certification without complying with procedures set forth in chapters 90.22 and 90.54 RCW. Ecology, on the other hand, maintains it has authority to require the conditions in order for the certification to comply with federal and state water quality standards. Both Ecology and the Center for Environmental Law and Policy argue that Elkhorn II controls.
The issue of Ecology's authority under the Federal Water Pollution Control Act, known as the Clean Water Act, 33 U.S.C. §§ 1251-1387, and under the state Water Pollution Control Act, chapter 90.48 RCW, is a matter of statutory construction that we review de novo.
The Clean Water Act is a "comprehensive water quality statute designed to `restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" Elkhorn II, 511 U.S. at 704, 114 S.Ct. 1900 (quoting 33 U.S.C. § 1251(a)). "The act also seeks to attain `water quality which provides for the protection and propagation of fish, shellfish, and wildlife.'" Id. at 704, 114 S.Ct. 1900 (quoting 33 U.S.C. § 1251(a)(2)).
Under § 303 of the Clean Water Act, each state must establish, subject to federal approval, comprehensive water quality standards setting water quality goals for intrastate waters. 33 U.S.C. §§ 1311(b)(1)(C), 1313. 33 U.S.C. § 1313(c)(2)(A) provides that a state water quality standard "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." Further, state water quality standards must "protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational" and other purposes. Id. Section 303 also contains an antidegradation policy, ensuring that state standards are adequate to maintain existing beneficial uses of navigable waters and prevent their further degradation. Elkhorn II, 511 U.S. at 705, 114 S.Ct. 1900. Thus, state water quality standards must "include `a statewide antidegradation policy' to ensure that `[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.'" Elkhorn II, 511 U.S. at 705, 114 S.Ct. 1900 (quoting 40 C.F.R. § 131.12 (1993)). Under the Clean Water Act, states may impose more stringent water quality controls. Elkhorn II, 511 U.S. at 705, 114 S.Ct. 1900 (citing 33 U.S.C. §§ 1311(b)(1)(C), 1370; 40 C.F.R. § 131.4(a) (1993)).
Pursuant to RCW 90.48.260, Ecology is the designated state agency for purposes of securing the benefits of and meeting the requirements of the Clean Water Act. RCW 90.48.260 states that
[t]he department of ecology is hereby designated as the State Water Pollution Control Agency for all purposes of the federal clean water act ... and is hereby authorized to participate fully in the programs of the act as well as to take all action necessary to secure to the state the benefits *759 and to meet the requirements of that act.[7]
In accord with this grant of authority, and as required by the Clean Water Act, Ecology promulgated comprehensive, specific water quality standards for regulating state navigable waters, as well as a statewide antidegradation policy. These provisions, set forth in the administrative code, were reviewed and approved by the federal Environmental Protection Agency as required by the Clean Water Act. Elkhorn II, 511 U.S. at 707, 114 S.Ct. 1900 (citing 33 U.S.C. 1313(c)(3); 42 Fed.Reg. 56,792 (1977)). The State's antidegradation policy is presently set forth in WAC 173-201A-070, which provides, among other things, that "[e]xisting beneficial uses shall be maintained and protected and no further degradation which would interfere with or become injurious to existing beneficial uses shall be allowed." WAC 270-201A-070(1).
Ecology inventoried the state waters, and placed them within five categories. WAC 173-201A-030. Sullivan Creek is classified as AA, extraordinary. Designated beneficial uses include salmonid migration, rearing, spawning and harvesting, wildlife habitat, recreation, and commerce and navigation. WAC 173-201A-030. Ecology acted to impose the instream flow conditions in this case to ensure that designated uses listed in this standard would not be degraded by operation of the Sullivan Creek project, in accord with § 303 of the Clean Water Act.
Under the Clean Water Act, the state is required to enforce water quality standards on intrastate waters. 33 U.S.C. § 1313(d)(4)(B). In addition, the state is responsible for providing water quality certificates under § 401 of the Clean Water Act. 33 U.S.C. 1341. These duties fall to Ecology under RCW 90.48.260. Generally, under § 401, any applicant for a federal license must obtain a state water quality certificate if the applicant's activities may result in discharge into intrastate waters. 33 U.S.C. 1341. The proposed Sullivan Creek project requires a license from the Federal Energy Regulatory Commission, and will result in discharge of diverted water back into Sullivan Creek. Accordingly, the project requires a § 401 state water quality certification.
Section 401(d) requires that
[a]ny certification ... shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title ... and with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section.
33 U.S.C. 1341(d).
In State Department of Ecology v. Public Utility District of Jefferson County, 121 Wash.2d 179, 849 P.2d 646 (1993) (Elkhorn I) (the decision reviewed in Elkhorn II), this court addressed the propriety of conditions in a § 401(d) water quality certification that required that the applicants maintain certain minimum instream flows in the Dosewallips River, also classified as AA. The applicants there were a city and a local utility district that wanted to build a dam, and applied for a hydroelectric license from the Federal Energy Regulatory Commission. A § 401 water quality certification was therefore required. The proposed site would reduce streamflow on a stretch of the river between the initial diversion and the place downstream where the water would be returnedthe bypass reach and would adversely affect the salmonid population in that portion of the river.
*760 This court upheld the streamflow conditions imposed by Ecology, reasoning that they were necessary to assure compliance with state water quality standards prohibiting the degradation of the state's waters, and specific standards prohibiting degradation of fish habitat and spawningdesignated uses for the Dosewallips.[8] The United States Supreme Court affirmed in Elkhorn II. The Court first held that once the threshold condition of existence of a discharge exists, then § 401(d) authorizes additional conditions and limitations on the applicant's activities as a whole. Elkhorn II, 511 U.S. at 711-12, 114 S.Ct. 1900. The Court then determined that ensuring compliance with § 303 is a proper function of the § 401 certification. Id. at 712-13, 114 S.Ct. 1900. Therefore, the Court concluded, state water quality standards adopted pursuant to § 303 are among the limitations that a state may use to ensure compliance in the § 401 certification process. Id. at 713, 114 S.Ct. 1900. Moreover, the Court held, "limitations necessary to ensure compliance with state water quality standards" are also permitted by § 401(d)'s reference to "`any other appropriate requirement of State law.'" Elkhorn II, 511 U.S. at 713-14, 114 S.Ct. 1900.[9]
The Court then turned to the question whether a minimum flow condition is a limitation necessary to ensure compliance with state water quality standards or any other appropriate requirement of state law, concluding that it is. The Court rejected the argument that § 401(d) conditions could be based only on specific chemical or numeric criteria. The Court reasoned that criteria can include broad, narrative terms, and that this state's water quality standards applicable to the Dosewallips are of this type. Elkhorn II, 511 U.S. at 715-16, 114 S.Ct. 1900. The Court upheld the minimum streamflow conditions as conditions necessary to meet the state's requirements that activities comport with designated usesfish spawning and habitat in the Dosewallips. The Court also held that the minimum flow conditions were necessary to comport with antidegradation policies. The Court observed:
[The Environmental Protection Agency] has promulgated regulations implementing § 303's antidegradation policy, a phrase that is not defined elsewhere in the [Clean Water] Act. These regulations require States to "develop and adopt a statewide antidegradation policy and identify the methods for implementing such a policy." 40 CFR § 131.12 (1993). These "implementation methods shall, at a minimum, be consistent with the ... [e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected." Ibid. [The Environmental Protection Agency] has explained that under its antidegradation regulation, "no activity is allowable ... which could partially or completely eliminate any existing use." ... Thus, States must implement their antidegradation policy in a manner "consistent" with existing uses of the stream.... [Washington State's] minimum stream flow condition is a proper application of the state and federal antidegradation regulations, as it ensures that an "[e]xisting instream water us[e]" will be "maintained and protected." 40 CFR 131.12(a)(1) (1993).
Elkhorn II, 511 U.S. at 718-19, 114 S.Ct. 1900. Thus, the minimum instream flow conditions were authorized under both state and *761 federal antidegradation regulations promulgated under authority of the Clean Water Act.
As to the argument that the Clean Water Act is concerned only with quality, and not quantity, the Court termed the distinction an "artificial" one, noting that in many cases water quantity is closely related to water quality. Id. at 719, 114 S.Ct. 1900. That is, "a sufficient lowering of the water quantity in a body of water could destroy all of its designated uses, be it for drinking water, recreation, navigations or, as here, as a fishery." Id. Moreover, the Court held, the definition of "pollution" in the Clean Water Act encompasses the effects of reduced water quantity.[10]Id. 33 U.S.C. § 1362(19) defines "pollution" as "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water."
Elkhorn II thus holds that a state may impose minimum instream flow conditions as part of § 401 water quality certification where necessary to enforce a designated use and conform to state and federal antidegradation policies.
The District contends, however, that Elkhorn II does not apply here because the District has existing water rights, unlike the applicants in Elkhorn II. The District argues that in light of § 101(g) and § 510(2) of the Clean Water Act, deferring to state law on water allocation, a condition that may affect the quantity of water available to one who holds an existing water right must be authorized by state law. There is no such state authorization, in the District's view. The District also contends that minimum flow requirements cannot be imposed without compliance with procedures set out in chapters 90.22 and 90.54 RCW.
We do not agree that Elkhorn II is distinguishable.
In Elkhorn II, the Court rejected the argument that § 101(g) and § 510(2) of the Clean Water Act, 33 U.S.C. § 1251(g) and § 1370(2), excluded regulation of water quantity from the Clean Water Act. The Court said that these sections give the states the authority to allocate water rights as between users, but "they do not limit the scope of water pollution controls that may be imposed on users who have obtained, pursuant to state law, a water allocation." Elkhorn II, 511 U.S. at 720, 114 S.Ct. 1900. The Court also said that a § 401 certification "merely determines the nature of the use to which that proprietary right may be put under the Clean Water Act" if and when a water right was obtained by the applicants in the case. Elkhorn II, 511 U.S. at 721, 114 S.Ct. 1900. The Court said that its view was supported by legislative history of a 1977 amendment to the Clean Water Act that added § 101(g).
The District, maintains, however, that the court's conclusion is dicta, because there were no existing water rights involved in Elkhorn II.
Section 101(g) provides:
It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.
33 U.S.C. § 1251(g). Section 510(2) states that nothing in the Clean Water Act shall "be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters ... of such States." 33 U.S.C. § 1370.
The District reasons that under § 101(g), conditions affecting the right to use water under a state water right, i.e., conditions relating to water quantity, may be imposed only if allowed under state law. Thus, in the District's view, a condition imposed pursuant *762 to the Clean Water Act alone, without additional state authorizing legislation, may not be imposed if it limits the amount of water a water right holder may use under an existing water right.
We are convinced that § 101(g) and § 510(2) do not preclude legitimate regulation under the Clean Water Act that affects existing water rights.
As noted, the Court in Elkhorn II referred to the legislative history of § 101(g), also known as the Wallop Amendment. Senator Wallop's statements, quoted by the Court, are that
"[t]he requirements [of the Act] may incidentally affect individual water rights.... It is not the purpose of this amendment to prohibit those incidental effects. It is the purpose of this amendment to insure that State allocation systems are not subverted, and that effects on individual rights, if any, are prompted by legitimate and necessary water quality considerations."
Elkhorn II, 511 U.S. at 721, 114 S.Ct. 1900 (quoting COMM. ON PUBLIC WORKS, 95TH CONG., 2D SESS., 3 LEGISLATIVE HISTORY OF THE CLEAN WATER ACT OF 1977, SERIAL NO. 95-14, at 532 (Comm. Print 1978)).
The Wallop Amendment came about as a compromise between the House and the Senate on the jurisdictional reach of § 404 of the Clean Water Act, which concerns permitting for the discharge of dredged or fill material into navigable waters. 33 U.S.C. § 1344. The controversy arose between passage of 1972 amendments to the Federal Water Pollution Control Act and the 1977 Clean Water Act, and involved the propriety of requiring § 404 permits for projects that affected "`waters of the United States,' as opposed to waters that were traditionally navigable." Gregory J. Hobbs, Jr., & Bennett W. Raley, Water Rights Protection in Water Quality Law, 60 U. COLO. L.REV. 841, 846 (1989). Among other things, this debate involved the issue of protection of wetlands. Id. Also during this time, the court in Natural Resources Defense Council v. Callaway, 392 F.Supp. 685 (D.D.C.1975) held that the Corps of Engineers, having administrative responsibilities under § 404, had to promulgate regulations concerning all waters of the United States, and not just traditionally navigable waters. Hobbs & Raley, 60 U. COLO. L.REV. at 846. Concern arose that farming practices, irrigation, and municipal water projects might be barred or restricted by § 404 permitting jurisdiction. Id. at 847. By 1977, a "standoff existed between the House and Senate as to the reach of § 404, and Senators Wallop and Hart were key in a series of compromises that became lawamong them, § 101(g). Hobbs & Raley, 60 U. COLO. L.REV. at 853-54.
Senator Wallop explained, in addition to the comments quoted above:
Water quality and interstate movement is an acceptable Federal role and influence. But the States [sic] historic rights to allocate quantity, and establish priority of usage remains inviolate because of this amendment. The Water Pollution Control Act was designed to protect the quality of water and to protect critical wetlands in concert with the various States. In short a responsible Federal role.
123 Cong. Rec. 39,212 (1977) (remarks of Senator Wallop).
The Senator also said that the amendment
will reassure the State that it is the policy of Congress that the Clean Water Act will not be used for the purpose of interfering with State water rights systems.... This amendment came immediately after the release of the Issue and Option Papers for the Water Resource Policy Study now being conducted by the Water Resources Council. Several of the options contained in that paper called for the use of Federal water quality legislation to effect Federal purposes that were not strictly related to water quality. Those other purposes might include, but were not limited to, Federal land use planning, plant siting and production planning purposes. This "State's jurisdiction" amendment reaffirms that it is the policy of Congress that this act is to be used for water quality purposes only.
123 Cong. Rec. 39, 211 (1977).
Legitimate water quality measures authorized by this act may at times have some effect on the method of water usage. Water *763 quality standards and their upgrading are legitimate and necessary under this act. The requirements of section 402 and 404 permits may incidentally affect individual water rights. Management practices developed through State or local 208 planning units may also incidentally affect the use of water under an individual water right. It is not the purpose of this amendment to prohibit those individual effects....
This amendment is an attempt to recognize the historic allocation rights contained in State constitutions.
It is designed to protect historic rights from mischievous abrogation by those who would use an act, designed solely to protect water quality and wetlands, for other purposes. It does not interfere with legitimate purposes for which the act was designed.
123 Cong. Rec. 39,212 (1977).
As this history shows, § 101(g)'s policy statement does not mean that the Clean Water Act has no applicability where an effect on existing water rights would result from application of the act. Section 101(g) is intended to preclude use of the Clean Water Act as a vehicle for federal purposes for which the act was not intended and which could subvert or abrogate state water allocation. Section 101(g) expresses the policy that allocation of a state's water resources is a matter within state jurisdiction. It also has as its purpose that federal agencies must cooperate with state and local agencies in achieving water quality.[11] However, water quality issues under the Clean Water Act, which include, as Elkhorn II holds, water quantity issues, i.e., instream flow levels affecting designated uses, are properly within the scope of the Clean Water Act. Conditions imposed to protect water quality fall within the legitimate purposes for which the Clean Water Act was designed.
Courts addressing the impact of § 101(g) generally conclude, consistent with its history, that it does not preclude legitimate regulation under the Clean Water Act. It has been viewed as a "general policy statement that requires the federal government accommodate state interests in the permit process to the extent possible consistent with the objectives of the regulatory program, but ... it is not a blanket immunization of state water rights holders from federal regulation." A. DAN TARLOCK, LAW OF WATER RIGHTS AND RESOURCES, § 5:91, at 5-162 (2001). In Riverside Irrigation District v. Andrews, 758 F.2d 508, 513 (10th Cir.1985), the court said with regard to § 101(g)
"that Congress did not want to interfere any more than necessary with state water management." National Wildlife Federation v. Gorsuch, 693 F.2d 156, 178 (D.C.Cir.1982). A fair reading of the statute as a whole makes clear that, where both the state's interest in allocating water and the federal government's interest in protecting the environment are implicated, Congress intended an accommodation. Such accommodations are best reached in the individual permit process.
In United States v. Akers, 785 F.2d 814 (9th Cir.1986), a farmer owning wetlands through which a river tributary flowed[12] challenged an order enjoining him from depositing dredged or fill material into certain waters, channels or wetlands, specified by the Corps of Engineers, without a permit (unless a permit was determined to be unnecessary or he did not receive a timely decision on whether a permit was not required). The farmer built a dike across the wetlands, and he argued the dike was an exempt irrigation facility for purposes of § 404's dredge and fill permit requirements. He also argued that *764 under § 101(g) the irrigation exemption should be applied so as to avoid impairment or abrogation of his state allocated irrigation rights, which he claimed were rendered virtually meaningless otherwise.
The court disagreed, reasoning that "any incidental effect on [the farmer's] rights to state-allocated water from [the river] is justified because protection of [the wetlands] is the type of legitimate purpose for which the [Clean Water] Act was intended." Akers, 785 F.2d, at 821. See also Water Works & Sewer Bd. v. U.S. Dep't of Army, 983 F.Supp. 1052, 1078 (1997) (policy announced in the Wallop amendment is "that the Corps not make its permitting decisions on the basis of water supply, thereby overruling state law water allocation determinations").
We conclude that § 101(g) does not prohibit conditioning a § 401 water quality certification on maintenance of specified instream flows necessary to meet the state's water quality standards promulgated under the Clean Water Act and necessary to protect designated uses, and to meet the federal and state antidegradation policies, regardless of whether the applicant has existing water rights. Nor does § 510(2), which does not contain anything substantive that § 101(g) does not contain.
Accordingly, the decision in Elkhorn II applies here, and requires that we affirm the Board's decision that Ecology has authority under the Clean Water Act to condition the District's water quality certificate on maintenance of the specified instream flows. See RCW 90.48.260. Bypass flow requirements as conditions in a water quality certificate do not reflect or establish an applicant's proprietary right to water, but "merely determines the nature of the use to which that proprietary right may be put under the Clean Water Act." Elkhorn II, 511 U.S. at 721, 114 S.Ct. 1900. Under the Clean Water Act, reduced stream flow can constitute pollution where it affects the physical or biological integrity of the water, as the Court reasoned in Elkhorn II. Id., 511 U.S. at 719, 114 S.Ct. 1900; see 33 U.S.C. § 1362(19). Ecology has authority under the Clean Water Act to prevent and control this kind of pollution, as Elkhorn II establishes. Ecology has been granted authority to "take all action necessary to ... meet" the requirements of the Clean Water Act. RCW 90.48.260. The bypass flow conditions imposed in this case are "reasonably calculated to protect existing fisheries habitat in Sullivan Creek," and thus meet water quality standards that include "salmonid migration, rearing, spawning, and harvesting" designated uses. Final Findings of Fact, Conclusions of Law and Order PCHB No. 97-177, at 17 (2000); see WAC 173-201A-030(2)(b)(iii); WAC 173-201A-120(6).
We do not agree with the District that under state law Ecology may impose instream flow conditions in a § 401 state water quality certificate only in accordance with procedures in chapters 90.22 and 90.54 RCW for setting minimum instream flows. Two entirely separate spheres of regulation are involved. We are here concerned with Ecology's authority to regulate water quality under the Clean Water Act. Instream flow conditions in a § 401 certification operate to ensure that a project will not violate lawful water quality standards. They apply only to the individual water right holder. They do not apply to other water right holders or applicants for water. Moreover, conditions in a § 401 water quality certificate are effective during the term of a federal license, and may be reevaluated or revised when a project is up for relicensing. In contrast, minimum instream flows under the state's water resources statutes constitute an appropriation, and have a priority date applicable to all water right holders and applicants in a water basin. RCW 90.03.345; Postema v. Pollution Control Hr'gs Bd., 142 Wash.2d 68, 80-82, 11 P.3d 726 (2000). It is for this reason that RCW 90.03.247 requires that "[w]henever an application for a permit to make beneficial use of public waters is approved relating to a stream or other water body for which minimum flows or levels have been adopted and are in effect at the time of approval, the permit shall be conditioned to protect the levels or flows."
As noted, the state Water Pollution Control Act grants authority to Ecology to take "all action necessary ... to meet the requirements" of the Clean Water Act. RCW 90.48.260. There is no restriction in chapter *765 90.48 RCW that prohibits Ecology, when carrying out this broad grant of authority, from imposing conditions that may affect an existing water right. This in sharp contrast to other areas of Ecology's regulatory authority. See, e.g., RCW 90.03.030; RCW 90.44.040. In this connection, we disagree with the District's contention that the absence of a savings clause in chapter 90.48 RCW has no significance. The District says that the state Water Pollution Control Act, chapter 90.48 RCW, simply authorizes the "discharge" of material into water that causes or tends to cause pollution, and authorizes cooperation with the federal government under the Clean Water Act. The District maintains that the withdrawal and use of water is not the same as the discharge of pollutant(s) under the state Water Pollution Control Act or the Clean Water Act. Therefore, the District says, neither the Congress nor the Legislature authorized regulation of the use of water under existing water rights.
Of course, Elkhorn II clearly holds to the contrary as far as the Clean Water Act is concerned, since it expressly holds that water quantity is not distinguishable from water quality where impact on designated uses is concerned: "reduced stream flow, i.e., diminishment of water quantity, can constitute water pollution." Elkhorn II, 511 U.S. at 719, 114 S.Ct. 1900 (citing 33 U.S.C. 1362(19)). As for the state act, we repeat once again that Ecology is authorized to take "all action" necessary to satisfy the Clean Water Act. We also note that RCW 90.48.030 states that "[t]he department shall have the jurisdiction to control and prevent the pollution of streams, lakes, rivers, ponds, inland waters, salt waters, water courses, and other surface and underground waters of the state of Washington." "Pollution" is defined broadly as
such contamination, or other alteration of the physical, chemical or biological properties, of any waters of the state, including change in temperature, taste, color, turbidity, or odor of the waters, or such discharge of any liquid, gaseous, solid, radioactive, or other substance into any waters of the state as will or is likely to create a nuisance or render such waters harmful, detrimental or injurious to the public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life.
RCW 90.48.020. This definition is, if anything, broader than the definition of "pollution" in the Clean Water Act. We similarly view the Water Pollution Control Act as encompassing man-induced reduction of water quantity as pollution where it has the negative effects outlined in RCW 90.48.020. Accordingly, the District's argument respecting the lack of a savings clause in chapter 90.48 RCW is without merit.
Finally, on this issue, we note that the Legislature has in fact expressly recognized Ecology's authority to set instream flow conditions in a state water quality certification under § 401 of the Clean Water Act. Chapter 90.82 RCW concerns cooperative watershed planning, and RCW 90.82.080 pertains to minimum instream flow components of such planning. According to RCW 90.82.020, "minimum instream flow" means a minimum flow under chapters 90.03 and 90.22 RCW, or a base flow under chapter 90.54 RCW. However, RCW 90.82.080(4) expressly provides that nothing in the chapter
(a) [a]ffects the department's authority to establish flow requirements or other conditions under RCW 90.48.260 or the federal clean water act (33 U.S.C. Sec. 1251 et. seq.) for the licensing or relicensing of a hydroelectric power project under the federal power act (16 U.S.C. Sec. 791 et seq.); or (b) affects or impairs existing instream flow requirements and other conditions in a current license for a hydroelectric power project licensed under the federal power act.
Thus, the Legislature has distinguished between minimum instream flows under chapters 90.03, 90.22, and 90.54 RCW, and instream flow conditions in a § 401 certification under the Clean Water Act and the Water Pollution Control Act, chapter 90.48 RCW.
We hold that Ecology has authority to impose instream flow conditions in a state water quality certification under § 401 of the *766 Clean Water Act regardless of whether the applicant for the federal license has existing water rights. The Board's summary judgment in favor of Ecology on this issue is affirmed.[13]

CONCLUSION
We hold that a water quality certification under § 401 of the Clean Water Act may be conditioned on maintenance of bypass flows in order to meet state and federal water quality standards ensuring that waters will not be degraded so as to interfere with or injure existing beneficial uses, and may do so where such conditions affect existing water rights. We hold that a change in point of diversion is not allowed under RCW 90.03.380 where the water right sought to be changed is an inchoate right, and that Ecology is not authorized to consider the public interest when deciding whether to grant an application for a change under the statute. We hold that the District's water rights were not abandoned or statutorily relinquished.
For the reasons stated, the Board's decisions are affirmed in part and reversed in part.
SMITH, JOHNSON, IRELAND, BRIDGE, CHAMBERS and OWENS, JJ., concur.
SANDERS, J. (dissenting).
Because the Department of Ecology (Ecology) imposed minimum instream flows which interfered with the existing water rights of Public Utility District No. 1 of Pend Oreille County (District) contrary to state and federal statutory law, I would reverse the portion of the Pollution Control Hearings Board (PCHB) ruling that upheld the conditional water quality certification issued by Ecology. Even if the statutes in question may be interpreted to provide Ecology with such sweeping authority, we are obligated by the principles of statutory construction to construe the statute in a manner consistent with the constitution. See, e.g., Grant v. Spellman, 99 Wash.2d 815, 818-19, 664 P.2d 1227 (1983). The majority's interpretation of § 401 of the federal Clean Water Act of 1977(CWA) (33 U.S.C. § 1341) and the Washington Water Pollution Control Act (WWPCA) violates this fundamental principle.
I also posit the portion of the PCHB ruling concluding the District's 440 cubic feet per second (cfs) water right is ineligible for change in point of diversion under RCW 90.03.380 is erroneous because the District's right is held by virtue of a valid permit issued pursuant to Washington's permitting statute.

I.
A. The federal CWA does not impair preexisting state created water rights.
The majority contends Ecology can subject the District to these additional minimum flow conditions under § 401 of the CWA, the WWPCA, or other state law. I disagree.
I posit to correctly construe and apply the federal CWA we must remain faithful to two fundamental principles which inhere in the act:
(1) the act is not designed to defeat preexisting water rights created by a state; and
(2) to the extent the federal act is applicable, it incorporates and substantiates state water quality standards, it does not exceed or trump them.
The CWA, 33 U.S.C. §§ 1251-1387, is a comprehensive water quality statute establishing distinct roles for the federal and state *767 governments. PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology, 511 U.S. 700, 704, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) (Elkhorn II). It is designed to "`restore and maintain the chemical, physical, and biological integrity of the Nation's waters'" and attain "`water quality which provides for the protection ... of fish, shellfish, and wildlife.'" Id. (quoting 33 U.S.C. § 1251(a)(2)).
Section 303 requires each state, subject to federal approval, to institute water quality standards that establish water quality goals for intrastate waters. 33 U.S.C. § 1313(a)(1). These standards shall consist of "the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." Id. § 1313(c)(2)(A).
Section 401 establishes the state certification process, which implements these standards and is the subject of this dispute. Under § 401(a), any applicant for a federal license "which may result in any discharge into the navigable waters" must provide the federal agency with a state certification that such discharge complies with state water quality laws. 33 U.S.C. § 1341(a)(1). Section 401(d) provides that certifications "shall set forth any effluent limitations and other limitations ... necessary to assure that any applicant for a Federal license or permit will comply ... with any other appropriate requirement of State law set forth in such certification, and shall become a condition on any Federal license or permit subject to the provisions of this section." Id. § 1341(d).
Section 510(2) provides that nothing in the CWA may be "construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters... of such States." 33 U.S.C. § 1370(2).
Section 101(g) also preserves state authority on water allocations yet also protects established state water rights. It provides:
It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be suspended, abrogated or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State.

33 U.S.C. § 1251(g) (emphasis added).
The legislative history of § 101(g) confirms Congressional intent to protect existing water rights. Section 101(g) was also known as the Wallop Amendment as it was sponsored in part by Senator Malcolm Wallop. According to Senator Wallop's comments, Congress added § 101(g) to reassure westerners that state water rights would not be "subverted" by the implementation of the CWA. Comm. on Public Works, 95th Cong., 2d Sess., 3 Legislative History of the Clean Water Act of 1977, Serial No. 95-14 ("Legislative History"), at 531-32 (Comm. Print 1978). Section 101(g) "will reassure the State that it is the policy of Congress that the Clean Water Act will not be used for the purpose of interfering with State water rights systems." Id. at 531.
Congress added § 101(g) to clarify its policy "concerning the proper role of Federal water quality legislation in relation to State water law." Id. at 532. "[N]othing in this act will be construed for the purpose of superseding or abrogating rights to quantities of water which have been established by a State." Id. at 531. Section 101(g) was "designed to protect historic rights from mischievous abrogation by those who would use an act, designed solely to protect water quality and wetlands, for other purposes." Id. at 532 (emphasis added).
On the relationship between legitimate water quality measures and existing rights, the senator explained:
Legitimate water quality measures authorized by this act may at times have some effect on the method of water usage. Water quality standards and their upgrading are legitimate and necessary under this act. The requirements of section 402 and 404 permits may incidentally affect individual water rights. Management practices developed through State or local 208 planning units may also incidentally effect [sic] the use of water under an individual water right. It is not the purpose of this amendment to prohibit those incidental effects. It is the purpose of this amendment to insure that State allocation *768 systems are not subverted, and that effects on individual rights, if any, are prompted by legitimate and necessary water quality considerations.
Id. (emphasis added). Although Senator Wallop specified §§ 208, 402, and 403, he did not include the § 401 certification as a legitimate source of incidental effects on existing individual water rights. Our majority misses this point.
The Supreme Court's opinion in Elkhorn II, while instructive, does not control the issues before us because it does not involve the imposition of a minimum flow requirement upon an existing right.[1] In Elkhorn II, petitioners proposed to build a hydroelectric project on the Dosewallips River. Elkhorn II, 511 U.S. at 708, 114 S.Ct. 1900. They were required to obtain a Federal Energy Regulatory Commission license, and because the project could result in discharges into the Dosewallips, they also had to obtain a state water quality certification. Id. at 709, 114 S.Ct. 1900. Ecology issued a certification but imposed a variety of conditions, including minimum instream flow conditions. Id. The petitioners moved for direct review before this court and we affirmed. Dep't of Ecology v. PUD No. 1 of Jefferson County, 121 Wash.2d 179, 849 P.2d 646 (1993) (Elkhorn I).[2] On petition for certiorari, the United States Supreme Court upheld Ecology's authority to impose a minimum flow requirement as a condition of certification to ensure compliance with state water quality standards. Elkhorn II, 511 U.S. at 723, 114 S.Ct. 1900.
Elkhorn II established a number of important rules. First, § 401 certifications are not limited to "discharges," as § 401(d) refers to "other limitations" in general to assure compliance with the CWA and other appropriate state law requirements. Elkhorn II, 511 U.S. at 711-12, 114 S.Ct. 1900. Second, state water quality standards adopted pursuant to § 303 of the CWA are among the "other limitations" in § 401. Id. at 713. The distinction between water quality and water quantity is "artificial." Id. at 719-20 (finding reduced stream flow "can constitute water pollution" under the definition of pollution in the CWA).[3] Moreover, the Court found the instream flow conditions imposed were permissible state water quality standards necessary to enforce the designated use of the river as a fish habitat. Id. at 714-19, 114 S.Ct. 1900.
The petitioner in Elkhorn II argued §§ 101(g) and 510(2) exclude water quantity from the coverage of the CWA. Id. at 720, 114 S.Ct. 1900. The Court stated these sections "preserve the authority of each State to allocate water quantity as between users; they do not limit the scope of water pollution controls that may be imposed on users who have obtained, pursuant to state law, a water allocation." Id. The Court also quoted Senator Wallop's comments to reinforce its holding. Id. at 721, 114 S.Ct. 1900.
The most significant fact distinguishing Elkhorn II from this case, a fact the majority practically ignores, is the petitioner in Elkhorn II had not yet obtained any water rights. The petitioner therefore could not assert § 101(g) protected an established water right. Accordingly the Supreme Court did not focus on the second sentence in § 101(g) stating, "nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State." 33 U.S.C. § 1251(g) (emphasis added). Instead the Court considered only the first sentence of § 101(g) regarding the authority of a state to allocate quantities of water.[4]
*769 In the current case the PCHB concluded, "the instream flow requirements in the water quality certification are reasonably calculated to protect the existing fisheries habitat in Sullivan Creek within the bypass reach." Clerk's Papers (CP) at 197. It correctly concluded, under Elkhorn II, water quantity may constitute pollution and be regulated under § 401.
However the PCHB erroneously concluded, as does our majority, that § 101(g) does not protect existing water right holders. The PCHB quoted the first sentence of § 101(g) that "authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this chapter" to support its conclusion that "section 101(g) does not shield a water right holder from compliance with water quality standards." CP at 171 (citing 33 U.S.C. § 1251(g)). However the PCHB did not address the second sentence that "nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State," clearly indicating the limit of federal authority to interfere with existing water rights. 33 U.S.C. § 1251(g).
The PCHB also relied on a truncated rendition of Senator Wallop's comments during the Senate debate over the adoption of § 101(g), omitting language critical to this case.[5] Significantly, the PCHB states the general proposition that "requirements [of the Act] may incidentally affect individual water rights," CP at 171 (alteration in original), but it omits Senator Wallop's reference to "requirements of section 402 and 404 permits." The PCHB also omitted altogether his next statement that "[m]anagement practices developed through State or local 208 planning units may also incidentally effect [sic] the use of water under an individual water right." Id. Yet the PCHB relied on this altered version of the quotation to support its conclusion. CP at 171.
Senator Wallop's comments demonstrate a § 401 certification cannot be allowed to impair existing water rights. His comments specifically identify three sources of "incidental effects" to individual water rights: § 402 (National Pollutant Discharge Elimination System) permits; § 404 (dredged or fill material) permits; and management practices developed under § 208 plans.
However § 401 certification is not among the "incidental effects" to individual water rights that fall outside the protection of § 101(g). Accordingly, § 101(g) precludes Ecology from imposing minimum instream flows on the District's existing established water right as a condition to certification.
For these reasons, I conclude federal law does not permit states to impose minimum instream flow conditions on a water quality certification that impairs existing water rights.
*770 B. The federal CWA incorporates state law standards.
Even if federal law allowed states to impose minimum instream flow conditions on water quality certifications prejudicing existing rights, Ecology must still possess the requisite state law authority to do so here. State procedures in chapters 90.22 and 90.54 RCW govern the establishment of minimum water flowsprocedures which also expressly prohibit Ecology from affecting existing water rights. Moreover, these procedures mandate minimum flows be established, if at all, by rule.[6]
Chapter 90.22 RCW authorizes Ecology "to establish, by rule, minimum instream flows or levels to protect fish, game, birds, other wildlife resources, and recreational and aesthetic values." Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 81, 11 P.3d 726 (2000). Establishing minimum instream flows requires public notice and hearing. RCW 90.22.020. However the establishment of minimum instream flows:
shall in no way affect existing water and storage rights and the use thereof, including but not limited to rights relating to the operation of any hydroelectric or water storage reservoir or related facility.
RCW 90.22.030 (emphasis added).
Ecology also can establish a water resources policy and program pursuant to chapter 90.54 RCW. However, if Ecology adopts a program or withdraws water under such a program, it must follow administrative procedures such as providing public notice and opportunity for comment. Additionally RCW 90.54.900 states:

[n]othing in this chapter shall affect any existing water rights ... nor shall it affect existing rights relating to the operation of any hydroelectric or water storage reservoir or related facility[.]
(Emphasis added.) Similarly RCW 90.54.920(1) mandates "[n]othing in this act shall affect or operate to impair any existing water rights." (Emphasis added.)
Chapters 90.22 and 90.54 RCW are the only lawful ways Ecology can set minimum instream flows that could affect the District's water rights, yet under these two schemes Ecology cannot impair existing water rights. RCW 90.22.030, 90.54.900, .920(1).
The majority opines the procedural requirements in chapters 90.22 and 90.54 RCW do not apply to Ecology's determination because the agency was setting the instream flow requirements for the District onlynot all water right holders or applicants in the basin where Sullivan Creek is located. Because Ecology was not setting instream flows universally applicable, the majority maintains chapters 90.22 and 90.54 RCW are inapplicable. Majority at 764-65.
The majority's position makes little sense. Chapters 90.22 and 90.54 RCW are the express statutory schemes for setting minimum instream flows. Both schemes require Ecology to follow the proper rule making process, affecting all users of the same water equally. Minimum instream flows constitute an appropriation affecting competing claims to the same water. Postema, 142 Wash.2d at 80-82, 11 P.3d 726. To accept the majority's argument, one must believe that Ecology for the same watercould discriminate amongst water right holders by setting minimum instream flows for one, while allowing others to take as much water as they need, even to the point that flows would be diminished below the minimum set as a precondition for power company usage. Where lies the logic (not to mention due process or equal protection)? How is the public interest served by establishing a minimum flow requirement for a user on one side of the creek which is inapplicable to a user of the same water on the opposite side?
The majority also contends Ecology's authority to impose minimum instream flows against the District's existing rights stems from the WWPCA. Majority at 764-65. It argues the state water resources laws (chapters 90.22 and 90.54 RCW) and the WWPCA (chapter 90.48 RCW) are separate spheres of regulation, and the water quality certification differs from establishing minimum instream flows pursuant to the state water resources *771 laws. Id. at 764-65. The majority contends the § 401 certification only affects the District's rights and has no effect on other water rights. Id. at 764. It maintains Ecology's authority to set instream flows on a § 401 certification stems from the CWA and the WWPCA. Id. at 764-65.
At the outset, I note neither Ecology nor the PCHB expressly justified its decision to impose instream flow conditions on the WWPCA. In any event, given the majority's reliance on the WWPCA, I discuss its applicability below.
The WWPCA provides Ecology is the state water pollution control agency for federal CWA purposes and generally can "take all actions necessary to secure to the state the benefits and to meet the requirements of the CWA. RCW 90.48.260. Pursuant to this grant of statutory authority, Ecology has adopted water quality standards to regulate our state navigable waters. Ch. 173-201A WAC. Ecology divides waters into five classes. WAC 173-201A-030. Sullivan Creek is classified AA, as "extraordinary." WAC 173-201A-120(1). This classification identifies specific designated uses as well as criteria applicable to such waters. WAC 173-201A-030. Here Ecology included instream flow conditions in the § 401 certification to ensure designated uses relating to fish, recreation, and navigation (all listed in WAC 173-201A-030) would not be threatened by the Sullivan Creek Project.
Ecology convinces our majority that because no provision in the WWPCA prevents Ecology from affecting existing rights, Ecology's authority is not so limited. Majority at 44. Ecology points to other statutes that include savings provisions to protect existing water rights, citing RCW 90.03.030 and 90.44.440. It argues because the Legislature did not include a savings provision in the WWPCA, its authority over parties with existing water rights is unlimited. This position is untenable.
The WWPCA authorizes Ecology to prevent and control water "pollution" in Washington. RCW 90.48.010. Ecology asserts the definition of water "pollution" is at least as broad as the definition in the federal CWA as interpreted by Elkhorn II, thereby implying authority to set instream flow conditions as pollution regulation. The majority is persuaded but provides virtually no analysis. Majority at 765.
However a change in water quantity alone cannot constitute "pollution" under our state law. The WWPCA defines "pollution" as:
such contamination, or other alteration of the physical, chemical or biological properties, of any waters of the state, including change in temperature, taste, color, turbidity, or odor of the waters, or such discharge of any liquid, gaseous, solid, radioactive, or other substance into any waters of the state as will or is likely to create a nuisance or render such waters harmful, detrimental or injurious to the public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life.
RCW 90.48.020 (emphasis added). In the list of "alterations" that constitute "pollution" the Legislature did not include changes in volume or reductions in quantity of water. Rather the reference is to the "physical, chemical or biological properties" of the water. One need not be a rocket scientist (or a marine biologist) to understand a little water does not necessarily have different properties than a lot of water. It may be true a constant discharge of an effluent into a smaller body of water may cause it to have a greater concentration of effluent than a larger body; however, here no effluent is added, rather a portion of the otherwise existing water is merely diverted. Hence, the "properties" of the water are unchanged.
Moreover, two years after it added the "pollution" definition, the Legislature enacted chapter 90.22 RCW which authorized Ecology to "establish minimum water flows [to] protect[] fish, game, birds or other wildlife resources, or recreational or aesthetic values," RCW 90.22.010, indicating its recognition that volume is distinct from quality. And, significantly, this legislation expressly prohibited Ecology from affecting existing rights when establishing minimum flows. RCW 90.22.030.
*772 The majority also attempts to find authority for Ecology to impair existing water rights by imposing instream flow conditions in a water quality certification under the state watershed planning statutes, chapter 90.82 RCW, enacted in 1997 and 1998. Majority at 765-66. Specifically, it points to RCW 90.82.080(4), which states:
Nothing in this chapter either: (a) Affects the department's authority to establish flow requirements or other conditions under RCW 90.48.260 or the federal clean water act for the licensing or relicensing of a hydroelectric power project under the federal power act; or (b) affects or impairs existing instream flow requirements and other conditions in a current license for a hydroelectric power project licensed under the federal power act.
The majority's reliance on this statute is misplaced. RCW 90.82.080(4) provides only that Ecology's authority in the circumstances enumerated is not reduced; it does not create additional authority to establish instream flow conditions. Further the watershed planning statutes define "minimum instream flow" by reference to chapters 90.03, 90.22, and 90.54 RCWall of which expressly prohibit impairing existing rights. RCW 90.82.020; see also RCW 90.03.010, 90.22.030, 90.54.900, .920(1). We must also note Ecology does not dispute that no watershed planning has ever occurred in connection with the Sullivan Creek project.
In C.J.C. v. Corp. of the Catholic Bishop, 138 Wash.2d 699, 708, 985 P.2d 262 (1999), we described the basic principles of statutory construction:
We construe an act as a whole, giving effect to all the language used. Related statutory provisions are interpreted in relation to each other and all provisions harmonized.
(Citation omitted.) The majority's strained statutory interpretation ignores these principles. Under the majority's view, chapters 90.22, 90.48, and 90.54 RCW cannot be harmonized. If the asserted definition of "pollution" in RCW 90.48.020 permits Ecology to establish minimum instream flows individually for each owner of an existing water right, this statute clearly conflicts with RCW 90.22.030, 90.54.900, and .920(1), which expressly prohibit Ecology from so acting.
Unlike the majority, I would reverse the PCHB ruling that affirmed Ecology's conditional water quality certification. Ecology can act only by legislative authorization. Rettkowski v. Dep't of Ecology, 122 Wash.2d 219, 226, 858 P.2d 232 (1993). Unless Ecology is considering an application for a new water permit under RCW 90.03.290, it must establish minimum instream flows pursuant to chapter 90.22 or 90.54 by the rule-making procedures therein. There is no statute state or federalauthorizing Ecology to impose instream flow conditions on a water quality certification pursuant to § 401 of the CWA, when such imposition interferes with established existing water rights. To hold otherwise necessarily implicates takings.
C. The court has a duty to construe statutes constitutionally.
We have oft stated and long repeated the maxim of statutory construction that statutes where possible should be afforded a constitutional, rather than an unconstitutional application.[7]See, e.g., State v. Furman, 122 Wash.2d 440, 458, 858 P.2d 1092 (1993); Grant v. Spellman, 99 Wash.2d 815, 827, 664 P.2d 1227 (1983); State v. Collins, 55 Wash.2d 469, 470, 348 P.2d 214 (1960); State v. Clausen, 160 Wash. 618, 632, 295 P. 751 (1931).
Water rights in Washington have long been understood to be usufructuary in nature they only constitute a right to use water, not a possessory right in the actual water itself. See, e.g., Rigney v. Tacoma Light & Water Co., 9 Wash. 576, 583, 38 P. 147 (1894); see Office of the Attorney General, An Introduction to Washington Water Law 1:2 (Jan.2000). That said, water rights are nonetheless "property," and are thus protected in this state against unlawful deprivation absent due process and governmental *773 "takings" or "damagings" absent just compensation first made. See Wash. Const. art. I, §§ 3, 16; Dep't of Ecology v. Grimes, 121 Wash.2d 459, 478, 852 P.2d 1044 (1993); Dep't of Ecology v. Adsit, 103 Wash.2d 698, 705-06, 694 P.2d 1065 (1985); Bach v. Sarich, 74 Wash.2d 575, 579, 445 P.2d 648 (1968); In re Clinton Water Dist. of Island County, 36 Wash.2d 284, 287, 218 P.2d 309 (1950); Washington Water Law, supra, at VII:13; 9 Julius L. Sackman, Nichols on Eminent Domain § 34.05[4], at 34-77 (rev.3d ed.1999); 2 Sackman, supra, § 5.05[1], at 5-309 (rev.3d ed.1999); David C. Hallford, Environmental Regulations as Water Rights Takings, 6 Nat. Resources & Env't 13, 13 (1991); Jan G. Laitos, Water Rights, Clean Water Act Section 404 Permitting, and the Takings Clause, 60 U. Colo. L.Rev. 901, 905 (1989).
A governmental abrogation of a preexisting, vested water right is an appropriation of that enhanced minimum flow to a public use and therefore is a taking encompassed in the Fifth and Fourteenth Amendments no matter how minimal the intrusion may be. See Tulare Lake Basin Water Storage Dist. v. United States, 49 Fed. CI. 313, 319-20 (2001) (discussing United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); Int'l Paper Co. v. United States, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931); Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)).
Commentators also agree if the application of water quality regulations conditions an existing water right to maintain minimum instream flows, and the required minimum flows de facto deny the right holder the ability to accomplish the purpose of the right in an economically feasible manner, then application of the regulation constitutes a taking requiring compensation sufficient to acquire an alternative supply means. See, e.g., Laitos, supra, at 919; Gregory J. Hobbs, Jr. & Bennett W. Raley, Water Rights Protection in Water Quality Law, 60 U. Colo. L.Rev. 841, 896-99 (1989).
The District[8] has maintained the purpose for which it obtained water rightsthe construction and operation of a hydroelectric facilitywill be entirely frustrated by the imposition of the minimum instream flows required by Ecology. See, e.g., Answer to Mot. for Discretionary Review at 6 (stating Ecology's requirements would make project "substantially worthless"); id. at 12 ("infeasible"); Br. of Resp't/Cross-Pet'r at 9 ("uneconomic" and would "not be built"); District's Reply Br. to Ecology's Arguments on Cross-Appeal at 9 n. 10 ("prohibit[s] the District's use of its water rights"). Additionally, Ecology concedes "there will be certain times of the year when the natural flow of Sullivan Creek will be insufficient to maintain the bypass flows while still permitting the full exercise of the water rights claimed by the District." Corrected Pet'r Reply Br. at 15. These statements are corroborated in the record.[9]
Here Ecology uses the water quality certification process to impose additional minimum instream flow conditions which significantly impair the District's existing permit rights. The District's preexisting right to 550 cfs total water rights was previously vested by permit subject only to a 10 cfs minimum flow condition before the Ecology order at issue here. See PCHB Hr'g Ex. of *774 Ecology-231, CP at 164. The new enhanced minimum flow imposed by the water quality certification order however multiplies by 20 times the original minimum flow requirement.
Were the applicable statutes construed to allow this, existing rights in property would be taken in arguable conflict with the federal takings clause as well as the state eminent domain requirement that no property be taken without just compensation having first been made.[10] This presents a problem of constitutional magnitude which could easily be avoided by an appropriate constitutional construction as urged in sections A and B.

II.
I also dissent from Ecology's purported authority to deny the District's change application for its 440 cfs water right on the basis of nonuse. The PCHB granted summary judgment approving Ecology's decision to deny the District's change application for its 440 cfs water right based on the assertion inchoate water rights are not eligible for a change in point of diversion under RCW 90.03.380(1). However, valid permit rights are eligible for a change in point of diversion. The case law on which the majority relies is off point and does not control whether Ecology has authority to consider an application to change the point of diversion for a right like the District's 440 cfs righta right issued pursuant to Washington's current statutory permit system.
The majority relies on Okanogan Wilderness League, Inc. v. Town of Twisp, 133 Wash.2d 769, 947 P.2d 732 (1997). Majority at 750-52. But that case did not involve inchoate water rights at all. The right at issue had been perfected and the main issue was whether it had been abandoned thereafter. Town of Twisp, 133 Wash.2d at 772-75, 781, 947 P.2d 732. The Court stated numerous times that quantification of a water right is needed before a change in point of diversion can be granted. See id. at 777-79, 947 P.2d 732. Requiring quantification of use during a change application makes sense in the context of a perfected water right because by definition water already has been used. However Town of Twisp never addressed whether a permit right is eligible for a change in point of diversion.
The majority also relies on R.D. Merrill Co. v. Pollution Control Hearings Bd., 137 Wash.2d 118, 969 P.2d 458 (1999). Majority at 750-52. But this case does not control either. R.D. Merrill stands for the proposition that Ecology cannot consider a change application when the applicant has no valid water right to change. 137 Wash.2d at 138, 969 P.2d 458. The water right in R.D. Merrill concerned application of Washington water law that predates the current statutory permit scheme. Because procedures under that law were not followed, this Court found "no valid right existed to change." Id. at 138, 969 P.2d 458. R.D. Merrill did not consider whether Ecology has authority to consider an application to change the point of diversion for right like the District's 440 cfs inchoate right issued pursuant to our existing permit scheme.
Ecology can act only pursuant to a grant of authority. Rettkowski, 122 Wash.2d at 226, 858 P.2d 232. This authority may be found in RCW 90.03.380 which permits Ecology to consider an application to change the point of diversion for an inchoate right issued pursuant to our existing permit scheme. The second sentence of RCW 90.03.380 authorizes a change of point of diversion of water "for beneficial use" if the change can be made without detriment or injury to existing rights. Here, although the District has not yet completed construction, diverted water, or put water to actual use, the District has a state-issued permit right to divert water "for beneficial use." Accordingly Ecology has the statutory authority to consider a change application concerning a permit right like the one the District possesses.
*775 Unlike the majority opinion, this construction of RCW 90.03.380 makes practical sense. As pointed out by the District:
when a party is in the process of fully utilizing a water right under a water permit, particularly where large sums of monies would be invested, it is likely that engineering and other considerations will result in changes in some of the details relating to the water right. Here, for example, after many years of studies and engineering and after administrative processes for obtaining permits, it was finally determined that the best plan for the reestablishment of power at the Sullivan Creek Project was to reinstall intake structures at Mill Pond rather than constructing a whole new dam a short distance upstream.
Br. of Resp't/Cross Pet'r at 41.
The majority's response is woefully inadequate. Without citing any authority, it claims that "a surface water right, involving as it does withdrawal from a visible source, does not present the engineering and planning difficulties that groundwater withdrawal may present, and this may be one distinction underlying the difference in the surface water and groundwater change statutes vis-à-vis inchoate rights." Majority at 751-52. Not only does this statement ignore the fact the District had a valid permit, but it is pure speculation, lacks any supportive data, and does not fit with what actually happened in this case.
The majority's position overlooks another significant consideration. Ecology can "administratively cancel" a permit when the holder has failed to use the water within a reasonable period of time and can grant extensions upon a showing of good cause. RCW 90.03.320. If Ecology can outright cancel a water permit, why does it not have the lesser authority to merely consider an application for change in point of diversion under a water permit?[11]
We should distinguish Town of Twisp and R.D. Merrill by holding inchoate water rights held under our current statutory permit system are eligible for change in point of diversion pursuant to RCW 90.03.380. This construction is consistent with the statutory language, does not conflict with prior case law, and makes good practical sense. Accordingly I would reverse the PCHB ruling that the District's 440 cfs water right is ineligible for change in point of diversion and remand the case to the PCHB for appropriate proceedings on this issue.

III.
While the majority opinion may mislead one to believe otherwise, our state's policy on water quality does have its limits. In addition to the constitutional protections over water rights, see supra Part I, our Legislature has expressed its commitment to industrial development and declaring hydroelectric power production a beneficial use of water as a matter of law. See RCW 90.48.010, 90.54.020(1). Notwithstanding these very legitimate public policy goals, our majority sanctions an overly restrictive, procedurally defective, and substantively unlawful water quality certification orderan agency order which not only illegally interferes with the District's established property rights but most likely will prevent the District from using its water rights to establish power generation to the public benefit of all in Pend Oreille County.
I would reverse the portion of the PCHB ruling which upheld Ecology's water quality certification order. I would also reverse the portion which concluded Ecology could not consider the District's application to change the point of diversion for its permit right.
I therefore dissent.
ALEXANDER, C.J., concurs.
NOTES
[1] The certification requires the following instream flows:

October 1-March 31 75 cfs
April 1-7 100 cfs
April 8-14 140 cfs
April 15-21 160 cfs
April 22-30 200 cfs
May 1-July 31 200 cfs
August 1-September 1 125 cfs

In re Granting a Certification to PUD No. 1 of Pend Oreille County, Dep't of Ecology, Order No. DE 97WQ-E361, at 3 (Wash. Oct. 28, 1997). From May 1 through September 30, the required flows are the lesser of the above flows or the natural flows entering Mill Pond.
[2] An inchoate water right is

"an incomplete appropriative right in good standing. It comes into being as the first step provided by law for acquiring an appropriative right is taken. It remains in good standing so long as the requirements of law are being fulfilled. And it matures into an appropriative right on completion of the last step provided by law."
Department of Ecology v. Theodoratus, 135 Wash.2d 582, 596, 957 P.2d 1241 (1998) (quoting 1 WELLS A. HUTCHINS, WATER RIGHTS LAWS IN THE NINETEEN WESTERN STATES 226 (1971)).
[3] The District also relies on In re Water Rights of Ahtanum Creek, 139 Wash. 84, 100, 245 P. 758 (1926) and Offield v. Ish, 21 Wash. 277, 281, 57 P. 809 (1899) for the proposition that this court has previously affirmed the right to change the point of diversion of an inchoate water right. In both case, however, the water right holder had perfected water rights.
[4] A change in the place of use, point of diversion, purpose of use, or any of these, to enable irrigation of additional land, or to add new uses is allowed provided that there is no increase in the annual consumptive quantity of water used. RCW 90.03.380.
[5] We find it unnecessary to address cases from other jurisdictions that Ecology cites, because RCW 90.03.380 is clear that no public interest test applies.
[6] In the factual background, XI, the Board states the fees were unpaid from 1986 to 1992, while in the factual background, XXVIII, the Board states the District inadvertently failed to pay the fees from 1986 to 1993. Amended Summary Judgment and Order, PCHB No. 97-177. The discrepancy does not affect our analysis.
[7] The statute then lists certain specific programs that Ecology is authorized to establish and administer. These are not exhaustive of the granted powers. First, the grant is of the power to "take all action necessary" to secure benefits under and meet requirements of the Clean Water Act, indicating broad authority. Further, the statute states, "[t]he powers granted herein include, among others. ..." RCW 90.48.260. Use of this language shows intent that the powers listed are not exclusive. Town of Ruston v. City of Tacoma, 90 Wash.App. 75, 84, 951 P.2d 805 (1998); see Brown v. Scott Paper Worldwide Co., 143 Wash.2d 349, 359, 20 P.3d 921 (2001) ("includes" is a term of expansion).
[8] The court additionally found the conditions were necessary to comply with federal water quality requirements, reasoning that man-induced alteration of streamflow levels is "pollution" within the meaning of the Clean Water Act. Dep't of Ecology v. Pub. Util. Dist. No. 1 (Elkhorn I), 121 Wash.2d 179, 187, 849 P.2d 646 (1993). The court also held that the conditions appropriately carried out RCW 90.54.020(3)(a), providing that "`[p]erennial rivers and streams of the state shall be retained with base flows necessary to provide for the preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values.'" Elkhorn I, 121 Wash.2d at 189, 849 P.2d 646 (citing RCW 90.50.020(3)(a).) The court determined that this state statute fell within § 401(d)'s reference to "any other appropriate requirement of State law[,]" which did not, in the court's view, limit conditions only to those necessary to carry out state water quality standards. Id., 121 Wash.2d at 189-90, 849 P.2d 646.
[9] The Court did not speculate as to whether any additional laws might fall within this reference, thus leaving unanswered the question whether, as this court had held, RCW 90.54.020 was such a state law.
[10] The Court also said that 33 U.S.C. 1314(f) expressly recognizes that water pollution may result from changes in movement, flow, or circulation, from dams or other diversions, thus also showing congressional concern with the physical and biological integrity of water. Elkhorn II, 511 U.S. at 719-20, 114 S.Ct. 1900.
[11] As the Court said in Elkhorn II, the language in § 101 (g) gives a state the authority to allocate water rights, and thus the Court found it "peculiar" that the applicants in Elkhorn II argued that it prevented the state from regulating stream flow. Pub. Util. Dist. No. 1 of Jefferson County v. Washington Dep't of Ecology, 511 U.S. 700, 720, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) (Elkhorn II).
[12] As the Ninth Circuit noted, the farmer conceded, for purposes of the case, that portions of his property were wetlands subject to permit requirements, and exemptions, of § 404 of the Clean Water Act. United States v. Akers, 785 F.2d 814, 816 n. 1 (9th Cir.1986).
[13] We note that additional issues are not before us. Although the District has suggested constitutional infirmities in the § 401 certification, the Board has no jurisdiction over such issues, see RCW 43.21B.110; see also Inland Foundry Co. v. Spokane County Air Pollution Control Auth., 98 Wash.App. 121, 124, 989 P.2d 102 (1999), reconsideration denied, 141 Wash.2d 1007, 10 P.3d 1073 (2000). Our review is of the agency action, and accordingly no constitutional issues are before us. The District acknowledges it is not asserting a takings claim at this time, although it indicates it may do so in the future.

We also do not reach an issue that the District attempts to raise for the first time on review, i.e., whether it can change its water rights under RCW 90.03.030. We parenthetically note that the briefing related to this statute is inadequate to decide the issue.
[1] No other cases have interpreted § 101(g) in the certification context.
[2] Elkhorn I also held Washington's antidegradation provisions in the state water quality act require imposing minimum instream flows. Elkhorn I, 121 Wash.2d at 186-187, 849 P.2d 646.
[3] State law authorizes the regulation of a "discharge" that causes "pollution." RCW 90.48.090, .095. The District argues that "discharge" is not at issue here, but only withdrawal of water. Elkhorn II states water quantity (and hence use affecting instream flows) may constitute "pollution" under the federal CWA. It nonetheless remains an open question whether "pollution" has the same broad meaning under our state law. I conclude it does not. See infra.
[4] Ecology argues "the Supreme Court's opinion was phrased as if there were previously existing water rights at issue." Corrected Pet'r Reply Br. at 24. However the facts of Elkhorn II alone did not require the Court to consider a case where a § 401 certification applicant already held a water right. The Court pointed out the affected water at issue was "undiminished by appropriation," and:

Moreover, the certification itself does not purport to determine petitioners' proprietary right to the water of the Dosewallips. In fact, the certification expressly states that a "State Water Right Permit must be obtained prior to commencing construction of the project." The certification merely determines the nature of the use to which that proprietary right may be put under the Clean Water Act, if and when it is obtained from the State.
Elkhorn II, 511 U.S. at 721, 114 S.Ct. 1900 (citations omitted). Elkhorn II never addressed whether § 101(g) prevents using the § 401 certification process to restrict diversions of water under the existing water right. Had the Court wanted to discuss this issue, it would have focused on the second sentence of § 101(g).
[5] The PCHB decision quotes the following version of Senator Wallop's comments:

The requirements [of the Act] may incidentally affect individual water rights.... It is not the purpose of this amendment to prohibit those incidental effects. It is the purpose of this amendment to insure that State allocation systems are not subverted, and that effects on individual rights, if any, are prompted by legitimate and necessary water quality considerations.
CP at 171 (ellipsis and alteration in original) (quoting Elkhorn II, 511 U.S. at 721, 114 S.Ct. 1900). cf. supra at 5 (passage quoted in full.) Omitted from the text replaced by the bracketed reference "of the Act" are the words "of section 402 and 404 permits." The majority opinion discusses the legislative history of the act yet does not recognize the PCHB's error or discuss its implications.
[6] Minimum instream flows may be established when a new water permit is issued. RCW 90.03.247, .290. New water permits are not at issue here.
[7] The majority ignores the District's claim that Ecology's actions exceeded its statutory authority in violation of the state and federal constitutions. See Answer of PUD to Mot. for Discretionary Review at 16; Br. of Resp't/Cross Appellant at 31.
[8] The District (although a municipal corporation which is in some senses "public") holds water rights for the production and sale of electricity, a proprietary enterprise. Sundquist Homes, Inc. v. Snohomish County Pub. Util. Dist. No. 1, 140 Wash.2d 403, 410, 997 P.2d 915 (2000); Wash. Pub. Power Supply Sys. v. Gen. Elec. Co., 113 Wash.2d 288, 301, 778 P.2d 1047 (1989); State v. O'Connell, 83 Wash.2d 797, 834, 523 P.2d 872 (1974). Its water rights therefore are its "private property." See also 2 Julius L. Sackman, Nichols on Eminent Domain § 5.06[8][a]. at 5-440 to 5-444 (rev. 3d ed. 1999); 4A Sackman, supra, § 15.01[2], at 15-9 to 15-10 (rev. 3d ed. 1999); Osborne M. Reynolds, Jr., Handbook of Local Government Law 72 (1982).
[9] John Snyder, a principal engineer to the Sullivan Creek Project, testified before the PCHB that the required instream flows are higher than the average natural flows for certain months. Verbatim Report of Proceedings (RP) at 97-100. He also maintained Ecology's minimum flows "would kill the project's feasibility from an economics standpoint." RP at 97. This sentiment is echoed by Larry Weis, general manager for the District, who testified that if the District were required to meet Ecology's minimum flows, "[t]here is just no way the project could be built, any kind of project could be built." Id.
[10] Under our state constitutional eminent domain provision a taking or damaging of private property which is otherwise legitimate may be accomplished only after, not before, compensation is paid. Anticipated violations of this constitutional mandate must be equitably enjoined. See Brown v. City of Seattle, 5 Wash. 35, 31 P. 313 (1892), 32 P. 214 (1893). Here no compensation has been made, so what sense is there to approve certificate conditions which should be enjoined from enforcement? The majority is silent.
[11] In spite of Ecology's current position on the matter, my asserted construction of RCW 90.03.380 appears to accord with how the agency itself operated in this case. In a 1993 letter to the District, Ecology advised:

Surface Water Permit No. S3-2658P allows the diversion of 550 cfs from three points of diversion [one not at issue here].... The PUD [District] will need to apply to change the point of each diversion to the Mill Pond Diversion structure.
PCHB Hr'g Ex. of Ecology-277.